1

2

3

4

5

6

7

8

The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

J. A., through his guardian, TARA ALLEN, et al., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

No. 20-cv-00640-RSM-MAT

MICROSOFT'S MOTION TO COMPEL ARBITRATION AND STAY CLAIMS

*Note on Motion Calendar:*
January 29, 2021

**Oral Argument Requested**

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 1

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ......................................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 1

    A.  Plaintiffs' Purchases of Xbox Controllers ........................................... 1

    B.  Plaintiffs' Agreements to Arbitrate...................................................... 2

        1.  Subscribers, Including Each Plaintiff, Agree to Arbitrate in the MSA. ............................................................................................... 3

        2.  Purchasers of Controllers Agree to Arbitrate Through In-the-Box Warranty Agreements. ............................................................. 6

    C.  Contrary to Their Arbitration Agreements, Plaintiffs Filed Suit. ....................... 10

III. ARGUMENT ............................................................................................. 11

    A.  The FAA Reflects a Strong Federal Policy in Favor of Arbitration and Requires Enforcing Arbitration Agreements According to Their Terms. .......... 11

    B.  Each Plaintiff Agreed to Arbitrate Disputes with Microsoft. ............................ 12

        1.  Plaintiffs Agreed to Arbitrate by Clicking Assent to the MSA, Forming a Contract under Applicable State Law. .................................. 13

        2.  Each Plaintiff Also Agreed to Arbitrate by Accepting the Warranty Agreement. ......................................................................... 15

    C.  The Arbitrator, Not the Court, Decides the Scope of Arbitration and the Enforceability of the Contracts Containing the Arbitration Agreements. .......... 19

        1.  Because the Agreements Incorporate AAA Rules, the Parties Agreed to Arbitrate Any Arbitrability Issues........................................... 19

        2.  Under Supreme Court Authority, the Arbitrator Must Decide Whether the Minor Plaintiffs' Contracts Are Disaffirmed. .................... 20

    D.  The Court Should Stay Any Claims Not Sent to Arbitration. ............................ 23

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - i

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013) ...................................................................................................10, 11

5

*Armstead v. Starbucks Corp.*,
    2017 WL 5593519 (S.D.N.Y. 2017) ......................................................................................13

6

7

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ..............................................................................................................11

8

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
    475 U.S. 643 (1986) ..............................................................................................................19

9

10

*Bergenstock v. LegalZoom.com, Inc.*,
    2015 WL 3866703 (N.C. Super. 2015) .................................................................................14

11

*Bey v. Midland Credit Mgmt., Inc.*,
    2016 WL 1226648 (D. Md. 2016) .........................................................................................16

12

13

*Brennan v. Opus Bank*,
    796 F.3d 1125 (9th Cir. 2015) ...............................................................................1, 12, 19, 20

14

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) .........................................................................................................21, 22

15

16

*Chamberlain v. LG Electronics U.S.A., Inc.*,
    2017 WL 3084270 (C.D. Cal. 2017) .....................................................................................16

17

*Creech ex rel. Creech v. Melnik*,
    147 N.C. App. 471, 556 S.E.2d 587 (N.C. Ct. App. 2001) ...................................................21

18

19

*Day v. Microsoft Corp.*,
    2014 WL 243159 (W.D. Wash. 2014) ..................................................................................14

20

*Dean Witter Reynolds Inc. v. Byrd*,
    470 U.S. 213 (1985) ..............................................................................................................11

21

22

*Diaz v. Nintendo of Am. Inc.*,
    2020 WL 996859 (W.D. Wash. 2020) .............................................................................19, 20

23

*DIRECTV, Inc. v. Imburgia*,
    136 S. Ct. 463 (2015) ............................................................................................................11

24

*Epic Sys. Corp. v. Lewis*,
    138 S. Ct. 1612 (2018) ..........................................................................................................10

25

26

*Garay v. Overholtzer*,
    332 Md. 339, 631 A.2d 429 (Md. Ct. App. 1993) .................................................................21

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Goetsch v. Shell Oil Co.*,
   197 F.R.D. 574 (W.D.N.C. 2000) .......................................................................................16

*Graf v. Match.com, LLC*,
   2015 WL 4263957 (C.D. Cal. 2015) ...................................................................................13

*Harbers v. Eddie Bauer, LLC*,
   2019 WL 6130822 (W.D. Wash. 2019) ..............................................................................12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   139 S. Ct. 524 (2019) .........................................................................................1, 11, 12, 19

*Hill v. Gateway 2000, Inc.*,
   105 F.3d 1147 (7th Cir. 1997) ......................................................................................15, 18

*In re Samsung Smartphone Marketing and Sales Practices Litig.*,
   298 F.Supp.3d 1285 (N.D. Cal. 2018) .............................................................16, 17, 18, 23

*In re Wyze Data Incident Litgation*,
   2020 WL 6202724 (W.D. Wash. 2020) ..............................................................................12

*Ingram v. Neutron Holdings, Inc.*,
   467 F. Supp. 3d 575 (M.D. Tenn. 2020) .............................................................................22

*Iverson v. Scholl Inc.*,
   136 Ill. App. 3d 962, 483 N.E.2d 893 (Ill. App. 1985)......................................................21

*Kai Peng v. Uber Techs., Inc.*,
   237 F. Supp. 3d 36 (E.D.N.Y. 2017) ..................................................................................13

*Krause v. Expedia Grp., Inc.*,
   2019 WL 4447317 (W.D. Wash. 2019) ..............................................................................20

*Kuznik v. Hooters of America, LLC*,
   2020 WL 5983879 (C.D. Ill. 2020)................................................................................22, 23

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) ........................................................................................................11

*Lombardi v. DirecTV, Inc.*,
   549 F. App'x 617 (9th Cir. 2013) .......................................................................................18

*Lyles v. Chegg, Inc.*,
   2020 WL 1985043 (D. Md. 2020) .......................................................................................13

*Maher v. Microsoft Corp.*,
   2018 WL 1535043 (N.D. Ill. 2018) ...............................................................................13, 14

*Marmet Health Care Ctr., Inc. v. Brown*,
   132 S. Ct. 1201 (2012) ........................................................................................................11

*Mendoza v. Microsoft Inc.*,
   2014 WL 4540225 (W.D. Wash. 2014)..........................................................................14, 20

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - iii

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)..................................................................................................12

*Miracle-Pond v. Shutterfly, Inc.*,
    2020 WL 2513099 (N.D. Ill. 2020) ...................................................................................13

*Moore v. Microsoft Corp.*,
    293 A.D.2d 587 (2002) ................................................................................................13, 14

*Norcia v. Samsung Telecomm'ns America, LLC*,
    845 F.3d 1279 (9th Cir. 2017) ....................................................................................16, 17

*Preston v. Ferrer*,
    552 U.S. 346 (2008).............................................................................................................11

*Prima Paint Corp. v. Flood & Conklin Mf'g Co.*,
    388 U.S. 395 (1967)...........................................................................................1, 20, 21, 22

*Schmidt v. Samsung Elecs. Am., Inc.*,
    2017 WL 2289035 (W.D. Wash. 2017).......................................................................16, 17

*Sovak v. Chugai Pharm. Co.*,
    280 F.3d 1266 (9th Cir.) ....................................................................................................11

*Swift v. Zynga Game Network, Inc.*,
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ..............................................................................13

*Talyancich v. Microsoft Corp.*,
    2012 WL 1563884 (C.D. Cal. 2012)............................................................................13, 14

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
    925 F.2d 1136 (9th Cir. 1991) ...........................................................................................22

*Walsh v. Microsoft Corp.*,
    2014 WL 4168479 (W.D. Wash. 2014)..............................................................................14

*Weimin Chen v. Sierra Trading Post, Inc.*,
    2019 WL 3564659 (W.D. Wash. 2019) ..............................................................................20

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 et seq. ........................................................... *passim*

Cal. Fam. Code § 6710 ...........................................................................................................21

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

# I.   INTRODUCTION

Plaintiffs allege they bought Xbox wireless game controllers with defects that, after periods of time ranging from a few months to over a year, supposedly interfered with the accuracy and success of their game play.  Based on these allegations, Plaintiffs bring a variety of claims and seek to represent a proposed nationwide class.  But Plaintiffs repeatedly agreed not to bring a lawsuit like this in court.  Instead, they assented to the Microsoft Services Agreement ("MSA") and to warranty agreements in which they promised they would arbitrate disputes on an individual basis using a consumer-friendly process before the American Arbitration Association ("AAA").  The Federal Arbitration Act requires enforcing these agreements.  9 U.S.C. §§ 3-4.

To the extent Plaintiffs dispute whether their claims come within the arbitration agreements, the parties agreed to have those disputes resolved by the arbitrator, not the Court.  Under *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019), the Court must honor the agreement to delegate these issues to the arbitrator.  The arbitrator likewise must resolve any questions as to the enforceability of the MSA and warranty agreements entered into by the minor Plaintiffs, J.A., C.C., A.D., A.H., and J.H.  Although the minor Plaintiffs purport to disaffirm the MSA and the warranty agreements in the Amended Complaint, the arbitrator—not the Court—must decide whether they can avoid those agreements.  *See Prima Paint Corp. v. Flood & Conklin Mf'g Co.*, 388 U.S. 395 (1967).

Accordingly, the Court's only task on this motion is to determine "whether there is an agreement to arbitrate between the parties"—which there was—and not to adjudicate what the agreement covers or whether any party has defenses to its enforcement.  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  The Court should enter an order compelling Plaintiffs individually to arbitrate their disputes with Microsoft and staying the case pending arbitration.

# II.   STATEMENT OF FACTS

## A.   Plaintiffs' Purchases of Xbox Controllers

Plaintiffs are eight individuals who assert they purchased Microsoft Xbox wireless controllers.  Am. Compl. ¶ 1.  Plaintiffs claim the controllers have a defect in the joystick,

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  causing "drift" or movement without user input after a period of use ranging from months to over

2  a year. *Id.* According to Plaintiffs, the "purpose of video game controllers" is "[a]ccurate

3  gameplay," so this alleged defect "interferes with proper game functioning." *Id.* ¶¶ 1-2.

4        Plaintiffs allege they bought standard or Elite Xbox wireless controllers between 2015

5  and November 2019. Am. Compl. ¶¶ 12, 17 (J.A. purchased standard controllers in November

6  2017, January 2018, and November 2018); *id.* ¶ 22 (A.D. purchased standard controller in June

7  2019); *id.* ¶ 29 (A.H. purchased standard controller in November 2019); *id.* ¶ 36 (J.H. purchased

8  standard controller in June 2019); *id.* ¶¶ 43-44, 46 (McFadden purchased Elite controllers in

9  2015 and 2017); *id.* ¶¶ 53, 57, 59 (Petti purchased Elite controllers in December 2015 and

10  December 2018 and standard controller in January 2016); *id.* ¶ 64 (Whisnant purchased Elite

11  controller in October 2018 and received replacement controller in January 2019); *see also id.*

12  ¶ 48 (C.C.)[1] (C.C. purchased three standard controllers on unspecified date). Each Plaintiff

13  alleges so-called controller drift interfered with his gameplay. Am. Compl. ¶¶ 11-14, 16-17

14  (J.A.); ¶¶ 47-49 (C.C.); ¶¶ 21-23 (A.D.); ¶¶ 28-30 (A.H.); ¶¶ 35-37 (J.H.); ¶¶ 46 & 51

15  (McFadden); ¶¶ 55, 58-61 (Petti); ¶¶ 66-67 (Whisnant). But the only Plaintiff to return his

16  controller was Whisnant, who received a replacement he alleges also suffered drift. *Id.* ¶ 68.

17  None of the other Plaintiffs returned their controllers to Microsoft, and most apparently continue

18  to use them. *See, e.g., id.* ¶¶ 51 (C.C.), 32 (A.H), 39 (J.H.), 52 (McFadden), 61 (Petti),

19  71 (Whisnant) (alleging continued issues with controllers).

20      **B.**    **Plaintiffs' Agreements to Arbitrate**

21        All users of Microsoft's Xbox gaming system agree to individually arbitrate their

22  disputes with Microsoft as a condition of their use of Xbox services and their purchase and use

23  of Xbox controllers. Specifically, each Plaintiff agreed to arbitration under the Microsoft

---

24  [1] The Amended Complaint contains nonsequential numbering in the section regarding Plaintiff

25  C.C.'s individual claims, with two sets of paragraphs numbered 46-51, and three paragraphs numbered 52 in the sections of the complaint related to Plaintiffs McFadden and Petti. Because

26  these repetitively numbered paragraphs appear within the sections of the Amended Complaint referring to individual Plaintiffs, this motion refers to the paragraphs with a notation of the

27  Plaintiff to which they relate, *e.g.*, ¶ 48 (C.C.).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Services Agreement ("MSA") and the arbitration agreement contained in the product guides for the Xbox controllers they purchased and on which they base their claims.

### 1. Subscribers, Including Each Plaintiff, Agree to Arbitrate in the MSA.

Xbox Live is an online interactive video game and entertainment service that Microsoft offers for use with its Xbox consoles.  Before August 2015, the Xbox Live Terms of Use ("TOU") governed the relationship between Microsoft and Xbox Live users.  Holbrook Decl. ¶ 3.  Users creating an Xbox Live account—or logging into their account after a TOU update— were required to accept the TOU by clicking an "I Accept" button signifying their acceptance on a screen displaying the TOU.  *Id*.  Starting in December 2011, the Xbox Live TOU included an arbitration agreement requiring individual arbitration to resolve disputes.  *Id.* ¶ 4 & Ex. A.  As a result, any user of Xbox Live after December 2011 had to affirmatively accept the Xbox Live TOU, with its arbitration agreement and class action waiver.  The following Plaintiffs use Microsoft accounts that accepted the TOU before the MSA replaced the TOU in 2015.  *Id.* ¶ 8:

| Plaintiff | Account/Gamertag | Account Registered |
|-----------|------------------|--------------------|
| C.C. | R****g | 12/25/2014 01:50:13 PM GMT |
| J.H. | S*************8 | 6/29/2014 04:49:07 PM GMT |
| McFadden | S************t | 12/29/2006 07:34:13 AM GMT |
| Petti | G*************7 | 9/22/2009 02:32:06 AM GMT |

In August 2015, the MSA replaced the Xbox Live TOU as the governing agreement for Xbox Live users.  *Id.* ¶ 5.  All Xbox Live subscribers were required to accept the MSA the first time they logged into Xbox Live after August 2015.  *Id.* ¶ 5 & Ex. B.  As with the TOU, users could accept the MSA through either a browser or their Xbox console.  Holbrook Decl. ¶ 5 & Ex. B.  Through either path, a user had an opportunity to review the full MSA, including its arbitration agreement, before deciding whether to click to indicate their acceptance and proceed, and the terms were made easily available for that review.  *Id.* ¶ 5.  Early versions of the acceptance page required a user to click "I accept" to indicate his or her agreement to the MSA.  *Id.* ¶ 7 & Exs. I-J.  Since 2019, the MSA acceptance page requires the user to click "Next" immediately below or adjacent to text explaining that doing so "means you agree to the

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 3

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Microsoft Services Agreement." *Id.* ¶ 7 & Exs. K, L (similar).  When a user signs up through an Xbox console, the acceptance screen displays a button linking to the MSA, *id.* Ex. L; on a browser, the words "Microsoft Services Agreement" are a blue hyperlink to the full terms.  *Id.* Ex. K.  In either form, the user has an opportunity to review the full MSA terms before deciding whether to accept.  Like the Xbox Live TOU, the August 1, 2015, version of the MSA contained a consumer-friendly arbitration agreement and class action waiver, as well as conspicuous notice in capitalized letters on the first page of the MSA alerting customers that they could find the full arbitration agreement at Section 15 of the MSA.  *Id.* ¶ 5 & Ex. B.  Every subsequent version of the MSA has included a materially identical arbitration agreement.  *Id.* ¶ 6 & Exs. C-F.

Users also agreed to be bound by future revisions to the MSA.  Section 7 of the August 1, 2015, version of the MSA provided that Microsoft

> may change these Terms at any time, and we'll tell you when we do.  Using the Services after the changes become effective means you agree to the new terms.  If you don't agree to the new terms, you must stop using the Services [defined to include Xbox Live], close your Microsoft account …, and, if you are a parent or guardian, help your minor child close his or her Microsoft account.

*Id.* Ex. B § 7.  Whenever Microsoft updates the MSA, it notifies users through (a) emails to their registered email address and (b) pop-up notices, known as "interrupt" notices, which appear when a user logs in to a service and which require a user to click "Next" to acknowledge notice of the update before they can proceed.  Holbrook Decl. at ¶ 6 & Exs. G and H.  Microsoft sends the email notice in advance so users have time to review the terms and discontinue use of their accounts if they do not agree.  *Id.* at ¶ 6 & Ex. H.

The MSA has always included a specific provision pertaining to Microsoft accounts used by minors, relevant here because Plaintiffs J.A., C.C., A.D., A.H., and J.H. allege they are under the age of eighteen.  In a section entitled "Kids and Accounts," the 2015 MSA provided:

> By using the Services, you represent that you have either reached the age of "majority" where you live or have valid parent or legal guardian consent to be bound by these Terms. …  If you are the parent or legal guardian of a minor that creates a Microsoft account or Skype account, you accept these Terms on the minor's behalf and are responsible for all use of the Microsoft

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 4

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

account, Skype account, or services, including purchases, whether the minor's account is now open or created later.

*Id.* Ex. B § 4.a.iii.  Every update to the MSA contained an identical "Kids and Accounts" provision.  *Id.* Exs. C-F § 4.a.iii.

Microsoft most recently updated the MSA effective October 1, 2020.  *Id.* ¶ 6.  Microsoft notified consumers, including Xbox Live subscribers, of this MSA update by email sent to the registered email address associated with each Microsoft account.  Holbrook Decl. ¶ 6 & Ex. H. Microsoft users logging into Microsoft services through a browser also received a pop-up interrupt notice requiring them to click to acknowledge the updated MSA.  *Id.* ¶ 6 & Ex. G.  The current version of the MSA, like each version before it, contains a binding arbitration agreement. The current MSA begins, in bold, capitalized text:

> **IF YOU LIVE IN (OR YOUR PRINCIPAL PLACE OF BUSINESS IS IN) THE UNITED STATES, PLEASE READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 15. IT AFFECTS HOW DISPUTES ARE RESOLVED.**

Section 15 provides for binding arbitration on an individual basis, without class actions:

> **Binding Arbitration and Class Action Waiver If You Live In (or If a Business Your Principal Place of Business Is In) the United States**.  We hope we never have a dispute, but if we do, you and we agree to try for 60 days to resolve it informally.  If we can't, you and we agree to **binding individual arbitration before the American Arbitration Association ("AAA") under the Federal Arbitration Act ("FAA"), and not to sue in court in front of a judge or jury**.  Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of review under the FAA.  **Class action lawsuits, class-wide arbitrations, private attorney-general actions, and any other proceeding where someone acts in a representative capacity aren't allowed.  Nor is combining individual proceedings without the consent of all parties.**

*Id.* Ex. F § 15.  The section specifies that arbitration will be conducted according to the AAA's Consumer Arbitration Rules for individual disputes, like Plaintiffs' individual claims here, valued at less than $75,000 or involving personal or household use.  *Id.*

Every one of the named Plaintiffs agreed to arbitrate their disputes with Microsoft by agreeing to the MSA.  *Id.* ¶ 8.  Microsoft maintains a table that updates whenever a user clicks to manifest assent to the MSA upon opening an account or to acknowledge receipt of an update; the

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 5

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

table thus shows the most recent occasion on which a user actively accepted the MSA.  Holbrook
Decl. ¶ 7.  Microsoft's records show Plaintiffs' acceptance of the MSA as follows:

| Plaintiff | Account/Gamertag | Time/Date MSA Acceptance |
|-----------|------------------|--------------------------|
| J.A. [2] | t*********s | 8/24/2020 4:28:17 PM |
| C.C. | R****g | 8/22/2020 9:41:32 PM |
| A.D. | S**********1 | 8/8/2019 5:33:10 AM |
| A.H. | S******z | 8/29/2020 5:53:39 PM |
| J.H. | S*************8 | 5/26/2018 9:34:28 AM |
| McFadden | S************t | 6/5/2018 8:37:53 PM |
| Petti | G*************7 | 8/21/2019 6:56:10 PM |
| Whisnant | B********X | 8/24/2019 6:06:23 PM |

*Id.* ¶ 8.  Microsoft's records further confirm that the accounts associated with all Plaintiffs except
A.H. received email notification of the October 1, 2020, MSA update.  *Id.*  (The Microsoft email
address A.H. used to open his account was never provisioned, meaning he never logged in to that
email.  *Id.*  A.H. did, however, click on an interrupt notice on August 29, 2020, acknowledging
the October 1 update.  *Id.* ¶ 8.d.)  Each account remains active.  *Id.* ¶ 8.  None of the named
Plaintiffs has stopped using Microsoft's services or closed his account, as the MSA directs users
to do if they do not agree to updated terms.

## 2.   Purchasers of Controllers Agree to Arbitrate Through In-the-Box Warranty Agreements.

Consumers also agree to individual arbitration when they use Xbox controllers.  Each
controller came with a product guide in the box informing the consumer that by using the
product, the consumer agreed to the applicable warranty—either the Limited Warranty or the
Warranty & Agreement (each, a "Warranty Agreement")—each of which contained an
arbitration agreement.  That agreement binds consumers to arbitrate disputes with Microsoft with
limited exceptions.  Each Plaintiff agreed to arbitrate with Microsoft by using the controllers on
which he bases his claims in this action.

---

[2] The gamertag associated with J.A. is registered to Tara Allen, J.A.'s guardian.  *See* Am. Compl.
¶ 10.  Plaintiffs' counsel has informed Microsoft that the t*********s account belongs to J.A.,
and Microsoft relies on that representation for purposes of this Motion.  References to J.A.'s
activity through this gaming account encompass all user activity on that account.

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 6

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

### a. Product Guides Alerted Purchasers to a Binding Warranty Agreement, Including an Agreement to Arbitrate.

All controllers sold between 2014 and September 2019 were packaged with a "product manual" informing users that use of the controller manifested agreement to Microsoft's terms of use.  O'Connell Decl. ¶ 4.  On its first page, the manual provided:

> **AGREEMENT TO XBOX ONE LIMITED WARRANTY AND SOFTWARE LICENSE TERMS**
> You must accept the Xbox Terms of Use (including Xbox software terms and game license terms) at xbox.com/live/termsofuse, the software license terms at xbox.com/xboxone/slt, and the Limited Warranty at xbox.com/xboxone/warranty to use your Xbox One console, Xbox accessories and/or Kinect for Xbox sensor. By using the Xbox One console, Xbox accessories and/or Kinect for Xbox One sensor, you agree to be bound by these terms. Please read them. If you do not accept them, do not set up or use your Xbox One console, Xbox accessories and/or Kinect for Xbox One sensor. Return the Xbox Product to Microsoft or your retailer for a refund.

*Id.*  ¶ 4 & Exs. A-C at 1.  The bold, capitalized header to this paragraph alerted consumers that "agreement" to the warranty and license terms was required.  The guides also summarized the arbitration agreement.  In bold text, the guide informed consumers: "**If you live in the United States, Section 9 of the Limited Warranty contains a binding arbitration clause and class action waiver, available at xbox.com/xboxone/warranty/arbitration.  The arbitration clause affects your rights about how to resolve a dispute with Microsoft.  Please read it.**"  *Id.* Exs. A-C at 4. The manuals summarized the key terms, including that "[t]he American Arbitration Association will conduct the arbitration under its Commercial Arbitration Rules."  *Id.*

In the product guides for controllers sold before October 2019, the notice excerpted above appeared immediately after two notices related to product safety.  *Id.* Exs. A-C at 1.  After October 2019, the product guides apprised consumers of the binding arbitration clause in the

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 7

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

very first text in the manual.  The October 2019 version of the product manual began:

**LIMITED HARDWARE WARRANTY & AGREEMENT (WITH BINDING ARBITRATION AND CLASS ACTION WAIVER IN THE U.S.)**

By purchasing or using your Microsoft Product, you agree to the Manufacturer's Limited Hardware Warranty & Agreement at support.microsoft.com/warranty. Please read the summary on page 5.

If you live in (or are a business with your principal place of business in) the United States, please read the binding arbitration clause and class action waiver at aka.ms/hw-warr-arbitration and the summary on page 5. It binds you and Microsoft and affects how disputes concerning your Microsoft Product, its price, advertising, marketing, communications, your purchase transaction, billing, or the Manufacturer's Limited Hardware Warranty & Agreement are resolved.

O'Connell Decl. ¶ 4 & Ex. D at 1.  On the fifth page, the 2019 manual summarized the warranty terms and arbitration agreement in bold font, directing consumers to the URL for the full terms. *Id.* Ex. D at 5.  Microsoft packed product manuals inside every standalone controller box, including the ones Plaintiffs purchased.  *Id.* ¶ 4.

Microsoft packed a similar product manual inside the box for controllers bundled with Xbox consoles, like the bundle Plaintiff McFadden purchased.  *Id.* ¶ 4 & Ex. E.  The product guide packaged with bundled controllers likewise advised consumers of the warranty terms and arbitration agreement in attention-drawing typeface, with a heading "**AGREEMENT TO XBOX ONE LIMITED WARRANTY AND SOFTWARE LICENSE TERMS**." *Id.* ¶ 4& Ex. E at 1.  It likewise summarized the arbitration agreement.  O'Connell Decl. Ex. E at 4.

> **b.  Notices Displayed on Controller Boxes Informed Consumers that Warranty Agreements Apply to Product Purchases.**

Consumers purchasing Xbox controllers were also alerted to the terms of their purchase by notices on the outside of the controller boxes.  Each Elite Controller product box displayed a notice that use of the product required accepting, among other things, Microsoft's Warranty Agreements.  *Id.* ¶ 5 & Exs. F-M.  Although the wording and typeface varied depending on the product box, every iteration drew the consumer's attention to the notice and the requirement of agreement.  For instance, the box for Mr. McFadden's 2015 Xbox One/Elite Controller bundle

marked the notice with the word "**IMPORTANT!**" in bold, capitalized text:

**IMPORTANT!** You must accept Xbox Software License Terms at xbox.com/xboxone/slt, Microsoft Services Agreement at microsoft.com/msa, and Limited Warranty at xbox.com/xboxone/warranty.

*Id.* ¶ 5 & Exs. F and G.  Microsoft displayed this notification on the same panel of the box that listed the contents of the box, so any consumer looking at the box to confirm the items in the bundle would also see the notice.  *Id.*  Similarly, the outside of other product boxes for the Elite Controller available in 2015, 2017, and 2018 advised—all but one in bold text—that the user "**must accept the Warranty & Agreement … and software License Agreement**" to use the product contained inside.  *Id.* ¶ 5& Exs. H, J, K, & M; *id.* ¶ 5 & Ex. I & L (similar).  Thus, no matter which version of the Elite Controller each Plaintiff bought, the product box provided notice that he had to accept the Warranty Agreement as a condition to using the controller.

Likewise, the outside of the boxes in which Microsoft sold standard controllers displayed language alerting purchasers to the warranty and providing the URL where a purchaser would find the full warranty terms.  In the version of the box Microsoft began using in May 2017, for instance, the box informed purchasers in bold font "**You must accept the Warranty & Agreement** at xbox.com/xboxone/warranty."  O'Connell Decl. ¶ 5 & Exs. Q and U.  Other versions of standard controller boxes released after March 2016 also noted the warranty and provided prospective purchasers with the URL where they could review the terms before deciding whether to complete their purchases.  *Id.* ¶ 5 & Exs. N-P, R-T.  Boxes for special edition controllers, like the one Petti alleges he bought in January 2016, also displayed notices advising purchasers that "[b]y using this accessory, you accept the limited warranty at xbox.com/xboxone/warranty."  *Id.* ¶ 5 & Exs. V-W.

**c.**  **Microsoft's Warranty Agreements Highlighted Arbitration Agreements.**

When consumers visited the URL as directed in the product guides and on the controller boxes, they found the Warranty Agreements applicable to their purchases.  Each version of the Warranty Agreements highlighted the binding nature of the agreement, including the arbitration

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

agreements they contained.  The 2015 Warranty Agreement first explained that "**BY USING YOUR XBOX ONE OR ACCESSORY, YOU AGREE TO THIS WARRANTY**," which "gives You specific legal rights." *Id.* ¶ 6 & Ex. X at 1.  Then, in bold font, the Warranty Agreement provided: "**If You live in the United States, Section 9 contains a binding arbitration clause and class action waiver.  It affects Your rights about how to resolve a dispute with Microsoft.  Please read it.**" *Id.*

The Warranty Agreements from 2018 to the present likewise informed the consumer, in capitalized text with the bold heading "**CONSENT TO BINDING ARBITRATION AND CLASS ACTION WAIVER**" in the middle of the first page, that Section 11 contained an arbitration provision.  O'Connell Decl. ¶ 6 & Exs. Y and Z.  Both Section 9 of the 2015 Warranty Agreement and Section 11 of the 2018 and 2019 Warranty Agreements provided for individual arbitration before the AAA for all disputes not related to intellectual property.  *Id.* ¶ 6 & Exs. X-Z.  And they each selected the AAA rules, including the Supplementary Procedures for Consumer-Related Disputes, for consumers using the products for personal or household use, or if the value of the dispute is $75,000 or less.  *Id.*

**C.**     **Contrary to Their Arbitration Agreements, Plaintiffs Filed Suit.**

Despite having agreed to arbitrate their disputes with Microsoft on an individual basis, Plaintiffs filed this lawsuit claiming their controllers were defective and purporting to represent nationwide classes.  The Plaintiffs bring claims for breach of warranty, breach of the implied warranty of merchantability, and unjust enrichment, as well as under various state consumer protection laws.  Am Compl. ¶¶ 143-254.  The minor Plaintiffs each purport to disaffirm their "End User Licensing Agreement" with Microsoft.  Am. Compl. ¶¶ 19 (J.A.); 52 (C.C.); 26 (A.D.); 33 (A.H.); and 40 (J.H.).  Plaintiffs' lawsuit, however, flouts their agreements to arbitrate their disputes with Microsoft on an individual basis.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

## III.   ARGUMENT

### A.   The FAA Reflects a Strong Federal Policy in Favor of Arbitration and Requires Enforcing Arbitration Agreements According to Their Terms.

Under the FAA, written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress passed the FAA "in response to widespread judicial hostility to arbitration."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013).  It "directed courts to abandon their hostility and instead treat arbitration agreements as 'valid, irrevocable, and enforceable.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting 9 U.S.C. § 2).  The FAA thus "requires courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted.'"  *Id.* (quoting, with modification, *Am. Express,* 570 U.S. at 233); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  "The overarching purpose of the FAA … is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceeding."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) ("benefits of private dispute resolution [include] lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)).  If a court compels arbitration in a dispute filed in federal court, the FAA requires that the litigation be stayed to allow arbitration to take place.  9 U.S.C. § 3.

The FAA is mandatory and does not allow courts to delve into policy considerations regarding arbitration.  It "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  As the Supreme Court has repeatedly emphasized, this "national policy favoring arbitration" supersedes "state [law] attempts to undercut the enforceability of arbitration agreements."  *Preston v. Ferrer*, 552 U.S. 346, 353 (2008); *see also Marmet Health Care Ctr.,*

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

*Inc. v. Brown*, 132 S. Ct. 1201, 1203-04 (2012) (per curiam) (invalidating state rule barring arbitration agreements for certain personal injury or wrongful death claims); *DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 471 (2015) (invalidating California Court of Appeal's interpretation of arbitration clause that would "not place arbitration contracts 'on equal footing with all other contracts'"). In particular, plaintiffs may not avoid an arbitration agreement simply because it contains a class action waiver, *Concepcion*, 563 U.S. at 352; *see also DIRECTV, Inc.*, 136 S. Ct. at 468 ("judges of every State must follow" *Concepcion*), especially as plaintiffs generally have no "entitlement to class proceedings for the vindication of statutory rights," *Am. Express*, 570 U.S. at 234. Although the state law where each Plaintiff resides supplies the applicable contract formation principles, federal law under the FAA governs arbitration issues. *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269-70 (9th Cir.), *opinion amended on denial of reh'g*, 289 F.3d 615 (9th Cir. 2002); *see* Holbrook Decl. Ex. Y-Z § 10 ("the laws of the state where you live … govern … all [] claims … regardless of conflict of laws principles, except that the Federal Arbitration Act governs all provisions relating to arbitration"); *see id.* Ex. X § 8 (similar).

In deciding a motion to compel arbitration, the court must limit its review to two issues: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). And where (as here) the parties have delegated threshold arbitrability questions to the arbitrator, the Court must honor that agreement and allow the arbitrator (not the Court) to decide arbitrability, including the enforceability and scope of the arbitration agreement. *Id.* at 1130; *see also Henry Schein*, 139 S. Ct. at 528.

## B.   Each Plaintiff Agreed to Arbitrate Disputes with Microsoft.

Plaintiffs each agreed to arbitrate their disputes with Microsoft by accepting the MSA and by purchasing and using the Xbox controllers underlying this dispute.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1

**1.      Plaintiffs Agreed to Arbitrate by Clicking Assent to the MSA,
Forming a Contract under Applicable State Law.**

2

3

Every Plaintiff accepted the MSA by clicking to manifest their assent, as well as by

continuing to use their Microsoft accounts after receiving notice of each update to the MSA.

4

5

6

7

8

9

10

The MSA, like the Xbox TOU before it, is a "clickwrap agreement," which "presents the

user with a message on his or her computer screen, requiring that the user manifest his or her

assent to the terms of the license agreement by clicking on an icon." *Harbers v. Eddie Bauer,

LLC*, 2019 WL 6130822, at \*6 (W.D. Wash. 2019).  "[C]ourts throughout this circuit have

consistently upheld arbitration provisions contained in clickwrap agreements." *In re Wyze Data

Incident Litigation*, 2020 WL 6202724, at \*2 (W.D. Wash. 2020).  And each state where

Plaintiffs reside recognizes clickwraps as a valid method of assent to form a contract:

11

12

13

14

15

16

17

18

19

20

21

22

**California (Plaintiffs A.D., Petti).**  Under California law, "[a] reasonable user would

know that by clicking the registration button, he was agreeing to the terms and conditions

accessible via the hyperlink." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79-80 (2d Cir. 2017); *see

also Swift v. Zynga Game Network, Inc.,* 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011)

(compelling arbitration where contract involved "modified clickwrap" in which terms of service

not visible but accessible via hyperlink); *Graf v. Match.com, LLC*, 2015 WL 4263957, at \*4

(C.D. Cal. 2015) (enforcing arbitration where "users ... were required to affirmatively agree to

the Terms of Use when they clicked on a 'Continue' or similar button ... where it was explained

that by clicking on that button, the user was affirming that they would be bound by the Terms of

Use, which were always hyperlinked and available for review"); *Talyancich v. Microsoft Corp.*,

2012 WL 1563884, at \*3-\*4 (C.D. Cal. 2012) (dismissing for lack of venue based on forum

selection clause in Microsoft's Xbox Live clickwrap agreement).

23

24

25

26

**Illinois (Plaintiff J.A.).**  In *Maher v. Microsoft Corp.*, 2018 WL 1535043, at \*4-5 (N.D.

Ill. 2018), the court applied Illinois law and compelled arbitration of Xbox Live claims under the

MSA.  *See also Miracle-Pond v. Shutterfly, Inc.*, 2020 WL 2513099, at \*4 (N.D. Ill. 2020)

(clickwrap contract formation acceptable under Illinois law).

27

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

**Maryland (Plaintiff C.C.).**  "Courts applying Maryland law have upheld clickwrap agreements—that is, 'agreements that require a customer to affirmatively click a box on the website acknowledging receipt of an[d] assent to the contract terms before he or she is allowed to proceed using the website.'"  *Lyles v. Chegg, Inc.*, 2020 WL 1985043, at *3 (D. Md. 2020) (collecting cases).

**New York (Plaintiff McFadden).**  Courts applying New York law enforce agreements—including with Microsoft—that a user "accepted by using the [product] after having an opportunity to read the license at leisure" and clicking to indicate assent.  *Moore v. Microsoft Corp.*, 293 A.D.2d 587, 587 (2002); *see also Armstead v. Starbucks Corp.*, 2017 WL 5593519, at *3 (S.D.N.Y. 2017); *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 48 (E.D.N.Y. 2017) (courts "have upheld 'Sign-In Wrap' agreements where plaintiffs did not even click an 'I Accept' button, but instead clicked a 'Sign Up' or 'Sign In' button where nearby language informed them that clicking the buttons would constitute accepting the terms of service").

**North Carolina (Plaintiffs A.H., J.H., Whisnant).**  "[B]y 'clicking through' [process acknowledging agreement with terms], [plaintiffs] are deemed to have signed the agreement to arbitrate."  *Bergenstock v. LegalZoom.com, Inc.*, 2015 WL 3866703, at *7 (N.C. Super. 2015).

Further, courts (including courts in this district) have routinely applied these principles to find users formed contracts with Microsoft through clickwrap mechanisms.  *See, e.g.*, *Moore*, 293 A.D.2d at 587 (New York law); *Walsh v. Microsoft Corp.*, 2014 WL 4168479, at *3 (W.D. Wash. 2014) (applying Oregon law and compelling arbitration of Xbox Live claims under Xbox Live TOU); *Mendoza v. Microsoft Inc.*, 2014 WL 4540225, at *3 (W.D. Wash. 2014) (Oregon and Florida law); *Day v. Microsoft Corp.*, 2014 WL 243159, at *1 (W.D. Wash. 2014) (applying Florida law and compelling arbitration of claims under MSA); *Maher*, 2018 WL 1535043, at *4-*5 (Illinois law); *Talyancich*, 2012 WL 1563884, at *3 (California law).

The process by which Plaintiffs accepted the MSA fits squarely within this authority. Every user was required to click to manifest assent to the MSA when first registering an account or, for those who previously accepted the Xbox Live TOU, when Microsoft changed to the MSA

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 14

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

in 2015.  Holbrook Decl. ¶ 5.  Plaintiffs had an opportunity to review the MSA by clicking the

hyperlinked terms, which appeared near the button they were required to click to indicate their

acceptance of the MSA and proceed to game play.  *Id.* ¶ 7.  Each Plaintiff could not have

engaged in Xbox game play through Microsoft's services (as they state they did, in the Amended

Complaint), including on an Xbox Live account, without the accountholder first clicking to

indicate assent on a button near the hyperlinked terms.  *Id.*  Further, consistent with the MSA's

terms, users received notice of and an opportunity to review each MSA update before it went

into effect—most recently in the weeks before Plaintiffs filed their Amended Complaint.  *Id.* ¶ 6.

Microsoft's business records confirm each Plaintiff acknowledged notice of MSA updates, as

reflected in the chart set forth above.  And each Plaintiff has consistently used Xbox Live

services through the accounts associated with their gamertags, manifesting assent to the MSA

through continued active use.  *Id.* ¶¶ 5-8.

        In short, each Plaintiff agreed to the MSA, including its arbitration terms.

### 2.  Each Plaintiff Also Agreed to Arbitrate by Accepting the Warranty Agreement.

        The Warranty Agreements also are binding contracts that commit each Plaintiff to

arbitrate any dispute with Microsoft on an individual basis.  The product guides packed with the

Xbox controllers stressed that a user "must accept the Xbox Terms of Use," which included an

arbitration agreement, and the Warranty Agreement available "at xbox.com/xboxone/warranty,"

which also contained the arbitration agreement.  O'Connell Decl. ¶ 4 & Exs. A-E.  The notices

continued: "By using the… Xbox accessories… you agree to be bound by these terms.  Please

read them.  If you do not accept them, do not set up or use your… Xbox accessories… .  Return

the Xbox Product to Microsoft or your retailer for a refund."  *Id.* Ex. A-C, E; *id.* Ex. D (similar).

A few pages later, the guides highlighted that the Warranty Agreements included "**a binding

arbitration clause and class action waiver**" that "**affect[] your rights about how to resolve a

dispute with Microsoft**," and again provided the URL where a user could find the complete

arbitration terms.  *Id.* Exs. A-C, E at 4; *see id.* Ex. D at 5 (similar).  Each Plaintiff thus had ample

opportunity to review the arbitration agreement and class action waiver before deciding whether to use his Xbox controller.  If a Plaintiff did not want to accept the Warranty Agreements, including the arbitration agreements, he was instructed to "not set up or use your ... Xbox accessories" and instead to "[r]eturn the Xbox product to Microsoft or your retailer for a refund." *Id.* Ex. A-C, E; *id.* Ex. D (similar).

These Warranty Agreements create a valid contract in each of the five states where Plaintiffs reside.  Courts have long enforced in-the-box contracts packaged with the products to which they pertain.  For instance, in *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1149 (7th Cir. 1997), the Seventh Circuit applied Illinois law and enforced an arbitration clause contained in the terms packed in the box in which a computer was sold.  The court reasoned:  "Practical considerations support allowing vendors to enclose the full legal terms with their products. … Customers as a group are better off when vendors skip costly and ineffectual steps such as telephonic recitation, and use instead a simple approve-or-return device.  Competent adults are bound by such documents, read or unread." *Id.*

Likewise, in *Chamberlain v. LG Electronics U.S.A., Inc.*, 2017 WL 3084270, at *3 (C.D. Cal. 2017), a court applied New York law in enforcing a plaintiff's agreement to arbitrate, relying on a trio of New York cases "approv[ing] of the use of 'cash now, terms later' contracts," through which a user becomes bound to a contract if the user chooses to use a product after opening the packaging where terms can be found.  *Id.* at 3 (citing and quoting *Brower v. Gateway 2000, Inc.*, 246 A.D.2d 246, 251 (1998); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 33 (2d Cir. 2002); *Licitra v. Gateway, Inc.*, 734 N.Y.S.2d 389, 390 (Civ. Ct. 2001)).

California, Maryland, and North Carolina likewise give effect to in-the-box contracts.  *In re Samsung Smartphone Marketing and Sales Practices Litig.*, 298 F.Supp.3d 1285, 1297 (N.D. Cal. 2018) ("the current trend of California cases has been to enforce contracts even when consumers later receive the terms"); *Bey v. Midland Credit Mgmt., Inc.*, 2016 WL 1226648, at *4 (D. Md. 2016); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577 (W.D.N.C. 2000) (citing *Hill* and enforcing modified contract where consumer "continued to use the credit card and thus accepted

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 16

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

the terms and provisions" after receiving notice of the change); *see also Schmidt v. Samsung Elecs. Am., Inc.*, 2017 WL 2289035, at *2 (W.D. Wash. 2017) ("Washington law permits 'shrink-wrap' contracts contained within a product box, even if the consumer did not admit to reading that contract.").

As each state's law acknowledges, an in-the-box contract is effective as long as the consumer "receive[s] adequate notice of its existence." *Cf. Norcia v. Samsung Telecomm'ns America, LLC*, 845 F.3d 1279, 1289 (9th Cir. 2017). Here, the Microsoft product guides provide robust notice that the Warranty Agreements affect the consumer's legal rights and constitute a binding agreement. By contrast, in *Norcia*, "Samsung gave a brochure entitled 'Product Safety & Warranty Information,'" which "indicates that it contains safety information and the seller's warranty, which constitutes the seller's 'affirmation of facts or promise' relating to the" product. *Id.* Based on the brochure's title, "a reasonable person would not understand" it contained "bilateral contract obligations," *In re Samsung Galaxy*, 298 F. Supp. 3d at 1294, and the arbitration terms themselves were "inconspicuous" within the brochure, *Norcia*, 845 F.3d at 1289-90. Courts applying *Norcia* therefore have distinguished updated Samsung notices as adequately alerting consumers where they referred to "additional contractual *terms and conditions*," *Schmidt*, 2017 WL 2289035 at *4, "us[ing] classic contractual language," *In re Samsung Galaxy*, 298 F. Supp. 3d at 1294.

The prominence of the notice is significant as well. In *Schmidt*, for example, Judge Coughenour compelled arbitration under terms contained in a Samsung product pamphlet, where "[a]t the beginning, each brochure warned the reader that "**by using this device, you accept those [contained] terms and conditions**." *Schmidt*, 2017 WL 2289035, at *3 (alteration in original). And in *In re Samsung Galaxy*, the "location [of the terms] [wa]s prominently displayed on the front of the guidebook in the box," a "setup [] much more likely to notify consumers than *Norcia*'s 'Product Safety & Warranty Information' brochure." *In re Samsung Galaxy*, 298 F. Supp. 3d at 1294.

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Here, Microsoft gave Plaintiffs more than sufficient notice of the Warranty Agreements. As in *Schmidt* and *In re Samsung Galaxy*, Microsoft used "classic contractual language," *In re Samsung Galaxy*, 298 F. Supp. 3d at 1294, telling users they "must accept" the Warranty Agreements, including the arbitration agreement inside. As in *Schmidt* and *In re Samsung Galaxy*, the product guides here provided clear, up-front information about the binding nature of the Warranty Agreements, including the consumer's agreement to arbitrate.

Further, Microsoft's product packaging went a step beyond, alerting consumers to the warranty (and the need to "accept" the warranty terms) in a notice prominently displayed on the outside of the box, with the URL where a consumer could find the full warranty. O'Connell Decl., Exs. F-W; *see In re Samsung Galaxy*, 298 F. Supp. 3d at 1294 ("the boxes would make a reasonable person aware of the existence of other binding conditions as part of the purchase"). The product guides inside the boxes then notified users that the product should be used *only* if the user accepted the governing terms, including the Warranty Agreements. O'Connell Decl. ¶ 4 & Exs. A-E. And the guides told users in plain language that disputes must "be resolved only by individual binding arbitration under the Federal Arbitration Act before a neutral arbitrator whose decision will be final—not before a judge or jury, and not in a class action lawsuit or a class, representative, or private attorney general proceeding of any kind." *Id.*

It makes no difference that the full warranty terms were available only online instead of printed within the product guide. *See In re Samsung Galaxy*, 298 F. Supp. 3d at 1295 (referring to warranty "on the phone or on Samsung.com"); *see also Lombardi v. DirecTV, Inc.*, 549 F. App'x 617, 620 (9th Cir. 2013) (enforcing arbitration agreement where letter informed customer of arbitration requirement and provided URL for full terms). Nor does it matter whether the Plaintiffs visited the URL or actually read the terms of the Warranty Agreements. "A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Hill*, 105 F.3d at 1148. In any event, some of the Plaintiffs' own allegations confirm they were aware of the product warranty. *See* Am. Compl. ¶ 50 (C.C.'s mother "reached out to Microsoft support" but was informed his controller was outside warranty

period); ¶ 50 (McFadden "was under the impression such home repair might void the warranty,

and believed the short warranty had already expired."); ¶ 56 (Petti was informed his controller

was outside of the warranty period); ¶ 60 (Petti was aware of warranty for second Elite

controller); ¶ 68 (store provided Whisnant with a replacement controller, "even though he was

outside the 90-day warranty period").  These allegations confirm that consumers had ample

notice of the Warranty Agreements through the information packaged inside the controller boxes

and appearing on the outside of the boxes.

Plaintiffs' use of the controllers bound them to the Warranty Agreements, which included

the arbitration agreements that require arbitrating disputes with Microsoft on an individual basis.

The Court should hold Plaintiffs to their agreements and compel individual arbitration.

### C.   The Arbitrator, Not the Court, Decides the Scope of Arbitration and the Enforceability of the Contracts Containing the Arbitration Agreements.

The fact that Plaintiffs agreed to the MSA and the Warranty Agreements should resolve

this motion, as the arbitration provisions in both sets of agreements adopt AAA rules, thereby

delegating arbitrability issues to the arbitrator.  "If an arbitration provision contains a delegation

clause, the Court's inquiry ends."  *Diaz v. Nintendo of Am. Inc.*, 2020 WL 996859, at *1 (W.D.

Wash. 2020).  Further, the minor Plaintiffs' purported disaffirmance of their contracts presents a

contract-enforceability issue that, under Supreme Court authority, must go to the arbitrator.

### 1.   Because the Agreements Incorporate AAA Rules, the Parties Agreed to Arbitrate Any Arbitrability Issues.

The Supreme Court has recognized that "the question of who decides arbitrability is itself

a question of contract"; thus, "[w]hen the parties' contract delegates the arbitrability question to

an arbitrator, a court may not override the contract."  *Henry Schein*, 139 S. Ct. at 527, 529.

Federal law has long recognized that parties may delegate threshold questions of arbitrability to

the arbitrator by "clearly and unmistakably provid[ing]" for that delegation in the arbitration

agreement. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  If the

parties have delegated threshold questions of arbitrability, a court must honor that agreement and

allow the arbitrator to decide arbitrability issues, including the arbitration agreement's scope and

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 19

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

enforceability. *Brennan*, 796 F.3d at 1130.  In those instances, the only question for the court is "whether there is an agreement to arbitrate between the parties"—not what that agreement covers or whether a party has defenses to that agreement's enforcement.  *Id.*

Here, both the MSA and the Warranty Agreements select the AAA and its rules to govern arbitration.  Holbrook Decl. Exs. B-F; O'Connell Decl. Exs. X-Z.  Under those rules, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement," as well as "the existence or validity of a contract of which an arbitration clause forms a part."  AAA Consumer Rule R-14(a) and (b) (*available at* https://www.adr.org/sites/default/files/Consumer_Rules _Web_1.pdf); *see also Diaz*, 2020 WL 996859, at *1 ("[AAA] rules state that an arbitrator has the power to determine the scope of the arbitration agreement and the arbitrability of any claim or counterclaim.").  For this reason, the Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130 (noting "consensus" among courts of appeals on this holding).  Courts regularly apply this principle in granting motions to compel arbitration of consumer claims, including in this District.  *See, e.g.*, *Diaz*, 2020 WL 996859, at *1; *Krause v. Expedia Grp., Inc.*, 2019 WL 4447317, at *5 (W.D. Wash. 2019) (enforceability issues delegated to arbitrator); *Mendoza*, 2014 WL 4540225, at *4 (Under AAA Rules, "[d]elegation of arbitrability to the arbitrator includes the sort of enforceability arguments that [plaintiffs] make."); *Weimin Chen v. Sierra Trading Post, Inc.*, 2019 WL 3564659, at *4 (W.D. Wash. 2019) (applying *Brennan*; questions of scope of arbitration agreement delegated to arbitrator).

Any questions of the scope of the parties' agreement to arbitrate, like other questions of arbitrability, are therefore delegated to the arbitrator under Plaintiffs' arbitration agreements.

### 2.    Under Supreme Court Authority, the Arbitrator Must Decide Whether the Minor Plaintiffs' Contracts Are Disaffirmed.

The five minor Plaintiffs—J.A., C.C., A.D., A.H., and J.H—have signaled their intention to avoid their contractual promises, including their promise to arbitrate, through formulaic

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

disaffirmances of "End User Licensing Agreements" with Microsoft "related to use of ... Xbox One controllers." *See* Am. Compl. ¶¶ 19 (J.A.); 52 (C.C.); 26 (A.D.); 33 (A.H.); & 40 (J.H.). But this purported disaffirmance (even if read to reach the MSA and the Warranty Agreements) does not undermine their gateway arbitration obligation: those issues must go to the arbitrator in each of the minors' cases, for resolution on the facts unique to each minor.

The FAA requires a court to send a claim to arbitration even where a party challenges the enforceability of the contract containing the relevant arbitration provision. In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 404 (1967), the Supreme Court rejected a party's argument that it should not be required to arbitrate because it had been fraudulently induced to agree to the contract creating the arbitration obligation. The Court explained that, under Section 3 of the FAA, "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate," not defenses with respect to "the contract generally." *Id.* This rule "not only honor[s] the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the court." *Id.* Applying *Prima Paint*, the Supreme Court in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006), reiterated that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."

These principles require the Court to send the minor Plaintiffs' claims to arbitration, notwithstanding their litigation-driven effort to disaffirm their contracts. The states where the minor Plaintiffs reside, which provide the applicable law for their claims, allow minors to form contracts—subject only to later disaffirmance. *See* Cal. Fam. Code § 6710 ("Except as otherwise provided by statute, a contract of a minor may be disaffirmed by the minor before majority or within a reasonable time afterwards."); *Iverson v. Scholl Inc.*, 136 Ill. App. 3d 962, 968, 483 N.E.2d 893, 897 (Ill. App. 1985) ("The general rule applicable to all contracts, other than for necessaries, is that the contract of a minor is voidable and may be repudiated by the minor during minority or within a reasonable time upon achieving majority absent a ratification."); *Garay v.*

*Overholtzer*, 332 Md. 339, 367-68, 631 A.2d 429, 443 (Md. Ct. App. 1993) ("Generally, the law regards contractual obligations of minors as voidable, giving the minor child the choice whether to avoid the contract, or to perform it."); *Creech ex rel. Creech v. Melnik*, 147 N.C. App. 471, 476, 556 S.E.2d 587, 591 (N.C. Ct. App. 2001) ("In North Carolina, agreements or contracts, except for those dealing with necessities and those authorized by statute, 'are voidable at the election of the infant and may be disaffirmed by the infant during minority or within a reasonable time of reaching majority.'").  And the MSA allows for minors to create accounts only if their parents or legal guardians consent to the MSA on the minors' behalf.  *See* Holbrook Decl. Exs. B-F § 4.a.iii.

Thus, as a matter of state law, the minor Plaintiffs entered into contracts providing for arbitration; they simply now claim the contracts are voidable.  But the voidability of contracts with minors at most presents enforceability issues for each arbitrator to decide, not for the Court. In *Buckeye Check Cashing*, for instance, the Supreme Court reasoned that *any* challenges to a contract containing an arbitration agreement belong in arbitration, regardless "whether the challenge at issue would render the contract voidable or void."  546 U.S. at 448.  And even before *Buckeye Check Cashing*, the Ninth Circuit recognized that "*Prima Paint* applies to 'voidable' contracts—[including] those 'where one party was an infant.'"  *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991) (quoting Restatement (Second) Contracts § 7 comment b (1981)).  In those circumstances, "an arbitrator may properly decide whether a contract is 'voidable' because the parties have agreed to arbitrate the dispute." *Id.*  The only question reserved for the court is "the threshold issue of the *existence* of an agreement to arbitrate," and all other questions about the contract must be adjudicated by the arbitrator, pursuant to the parties' agreement.  *Id.* at 1140-41.

Applying these principles, courts hold that an arbitrator—not a court considering a motion to compel arbitration—must rule on a minor's purported disaffirmance of a contract.  In *Ingram v. Neutron Holdings, Inc.*, 467 F. Supp. 3d 575 (M.D. Tenn. 2020), for instance, the court held that a minor's repudiation of her agreement to arbitrate claims arising from her rental

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

of a scooter belonged in arbitration rather than before the court.  The court reasoned that "the defense of infancy … is effectively indistinguishable from other defenses such as fraud in the inducement that, if proven, provide grounds for rescission of a contract."  *Id.* at 581.  Under *Prima Paint*, "the validity of [the minor's] rescission of the contract as a whole, based on the doctrine of infancy, is a question reserved for the arbitrator under 9 U.S.C. § 4, because the plaintiffs use the defense to challenge the validity of the [contract] as a whole and not the Arbitration Provision specifically."  *Id.* at 585.  The minor's repudiation defense also "raise[d] an arbitrability question that, by contract, has been reserved for the arbitrator, irrespective of the objective merit of the defendant's claim that the dispute is subject to arbitration."  *Id.*  The court accordingly granted the motion to compel arbitration, staying the case.

The court reached the same conclusion in *Kuznik v. Hooters of America, LLC*, 2020 WL 5983879 (C.D. Ill. 2020), albeit on different reasoning equally applicable here.  In *Kuznik*, the court held that incorporating the JAMS rules to govern arbitration—like adopting the AAA Rules here—amounted to "clear and unmistakable evidence that the parties agree[d] to arbitrate arbitrability."  *Id.* at *4.  And the court determined that the plaintiff's claim of "voidability of the Arbitration Agreement due to his minority at the time of contracting" was a "gateway matter" delegated to the arbitrator.  *Id.*  So too, here, as the AAA Rules provide that the arbitrator "shall" adjudicate questions as to "the existence or validity of a contract of which an arbitration clause forms a part."  AAA Consumer Rule R-14.

As these cases hold, the arbitrator must decide any questions of a minor's purported disaffirmance of an agreement to arbitrate.  The minor Plaintiffs' alleged disaffirmance affords no basis for them to avoid arbitration.

### D.  The Court Should Stay Any Claims Not Sent to Arbitration.

Because the parties agreed to arbitrate arbitrability, each Plaintiff should be compelled individually to arbitrate all claims.  Section 3 of the FAA provides for a stay of litigation "until

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 23

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

1  such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.  The

2  Court should therefore stay this action pending individual arbitration of each Plaintiff's claims.[3]

3  **CONCLUSION**

4  Microsoft respectfully requests that the Court order Plaintiffs to submit their claims to

5  binding arbitration on an individual basis and stay this action pending individual arbitration of

6  each Plaintiff's claims.

7  DATED this 24th day of November, 2020.

8  Davis Wright Tremaine LLP
   Attorneys for Microsoft Corporation

9

10 By */s/ Stephen M. Rummage*
   Stephen M. Rummage, WSBA #11168

11 MaryAnn T. Almeida, WSBA #49086
   920 Fifth Avenue, Suite 3300

12 Seattle, WA  98104-1610
   Telephone: (206) 622-3150

13 Fax: (206) 757-7700
   E-mail: steverummage@dwt.com

14 E-mail: maryannalmeida@dwt.com

15

16

17

18

19

20

21

22

23

24 _____

25 [3] Even if the Court were to grant this motion to compel arbitration as to fewer than all Plaintiffs
   —which it should not do—it should stay the litigation in its entirety while arbitration proceeds.

26 *See In re Samsung Galaxy*, 298 F. Supp. 3d at 1304 (noting "courts have stayed all claims in an
   action even if only some of the claims will be arbitrated"; collecting cases).  "A stay of all claims

27 is particularly warranted in the class-action context because the complaint [alleges] that common
   questions of fact and law predominate."  *Id*.

MOTION TO COMPEL ARBITRATION
(20-cv-00640-RSM-MAT) - 24