UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| J.A., through his guardian, TARA ALLEN, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | CASE NO. C20-0640-RSM-MAT<br><br>REPORT AND RECOMMENDATION |

INTRODUCTION

Defendant Microsoft Corporation (Microsoft) filed a Motion to Compel Arbitration and Stay Claims. (Dkt. 36.) Plaintiffs oppose the motion. (Dkt. 39.) The Court, having considered the briefing and relevant record, herein recommends the Court GRANT the motion and STAY these proceedings pending the outcome of arbitration.

BACKGROUND

Plaintiffs brought this lawsuit against Microsoft on behalf of themselves and all other similarly situated consumers who purchased wireless, Microsoft-branded Xbox One controllers, including standard controllers accompanying an Xbox One console and separately sold Elite

Controllers Series 1 and Series 2. (Dkt. 32, ¶1.) Plaintiffs maintain a defect causes the controllers to register "phantom input or stick drift" and thwart accurate gameplay, i.e., properly registering user input on a controller, which is the central purpose of video game controllers.

Plaintiffs reside in a number of different states and include Donald McFadden (New York), Brandon Petti (California), and Samuel Whisnant (North Carolina), and five minors proceeding through their guardians: J.A. (Illinois); C.C. (Maryland); A.D. (California); A.H. (North Carolina); and J.H. (North Carolina). (*Id.*, ¶¶10-72.) Plaintiffs purchased their controllers between 2015 and 2019 and allege the drift defect interfered with and prevented their accurate gameplay. They bring claims for breach of express warranty, breach of implied warranty of merchantability, unjust enrichment, and violations of state consumer protection laws, and seek both a public injunction and monetary relief. The minor plaintiffs disaffirm their "End User Licensing Agreement" with Microsoft and aver they ceased use of the defective controllers. (*Id.*, ¶¶19 (J.A.), 52 (C.C.), 26 (A.D), 33 (A.H.), and 40 (J.H.))

Microsoft posits that plaintiffs, like all users of its Xbox gaming system, agreed to individually arbitrate disputes with Microsoft as a condition of their use of Xbox services and purchase and use of Xbox controllers. They contend each plaintiff agreed to arbitration: (1) under the Microsoft Services Agreement (MSA) governing the relationship between Microsoft and users of Xbox Live, an online interactive video game and entertainment service offered for use with xBox consoles; and (2) pursuant to the arbitration agreement contained in product guides for the xBox controllers purchased. (Dkt. 36.) Noting the arbitration provisions in both agreements adopt American Arbitration Association (AAA) rules, Microsoft asserts the parties delegated any arbitrability issues to an arbitrator, including the issue of whether the minor plaintiffs disaffirmed their contracts. Microsoft asks that the Court order plaintiffs to submit their claims to binding

arbitration on an individual basis and stay this action pending that arbitration.

Plaintiffs deny an agreement to arbitrate exists. They also contend the arbitration agreements and delegation provisions are unconscionable, and that the agreements are invalid as to California claims in prohibiting public injunctive relief and not enforceable against disaffirming minors. They ask the Court to reject the motion to compel and, should the court compel arbitration over certain claims, that litigation as to any remaining claims be allowed to proceed.

### DISCUSSION

A.     Legal Standard

Under the Federal Arbitration Act (FAA), written agreements to arbitrate disputes arising out of transactions involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party aggrieved by the failure or refusal to arbitrate under a written agreement for arbitration may petition the district court for an order directing arbitration to proceed as provided for in the agreement. 9 U.S.C. § 4. A court may not, however, compel arbitration before resolving whether a valid arbitration agreement exists. *Lifescan, Inc. v. Premier Diabetic Servs.*, 363 F.3d 1010, 1012 (9th Cir. 2004). *See also AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 648 (1986) ("'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'") (quoted source omitted).

The Court, as a general matter, determines two issues with a motion to compel arbitration: "(1) whether a valid agreement to arbitrate exists and, if it does (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *accord Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The party seeking to compel arbitration "bears 'the burden of proving the existence of an agreement to

arbitrate by a preponderance of the evidence.'" *Norcia v. Samsung Telecomm. Am.*, 845 F.3d 1279, 1283 (9th Cir. 2017). This burden is substantial and the Court must give the party denying the existence of an agreement to arbitrate "'the benefit of all reasonable doubts and inferences that may arise.'" *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (quoted source omitted). In this inquiry, the Court applies ordinary state-law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Norcia*, 845 F.3d at 1283.

Upon finding an agreement to arbitrate, the FAA "'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration[.]'" *Chiron Corp.*, 207 F.3d at 1130 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985).

Parties to a contract may also "agree to have an arbitrator decide, not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, __ U.S. __, 139 S. Ct. 524, 529-30, 202 L.Ed.2d 480 (2019) (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)). Where parties include such a gateway or "delegation" clause, it is "simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 70. If a valid agreement exists and delegates arbitrability issues to an arbitrator by "'clear and unmistakable'" evidence, "a

court may not decide the arbitrability issue." *Henry Schein, Inc.*, 139 S. Ct. at 529-30 (quoted and cited sources omitted). This is true "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.* Under Ninth Circuit law, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130.

B.   Existence of Agreements to Arbitrate

Microsoft maintains plaintiffs entered into binding arbitration agreements through two separate avenues. The Court addresses the two types of agreements below.[1]

1.   Clickwrap agreement:

In creating an Xbox live account, plaintiffs were required to accept, prior to August 2015, the Xbox Live Terms of Use (TOU) and, after August 2015, the MSA by clicking a button, either through the Xbox One console or a personal computer. (Dkt. 37 (Decl. of Andreas Holbrook), ¶¶2-7.) They were required to accept updates in order to continue to use Xbox Live. (*Id.*, ¶¶3(c), 6, Exs. C-E.) Both the TOU (as of December 2011) and the MSA include a binding arbitration clause and class action waiver. (*Id.*, ¶¶4-5, Exs. A & B.) Since 2019, users click "Next" and are informed doing so means the user agrees to the MSA, while earlier versions required users to click

---

[1] The parties dispute the state law applicable to plaintiffs' claims. Plaintiffs assert Washington law presumptively applies given the absence of an actual conflict between the laws and interest of Washington and those of another state, *Tilden-Coil Constructors, Inc. v. Landmark Am. Ins. Co.*, 721 F. Supp. 2d 1007, 1012-13 (W.D. Wash. 2010) (citing *Erwin v. Cotter Health Ctrs.*, 161 Wn.2d 676, 167 P.3d 1112, 1120-21 (2007)), and because Washington has a paramount interest in and most significant relationship to a conflict involving one it's "largest corporate citizens," *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 553 (W.D. Wash. 2008). Microsoft notes that none of the plaintiffs live in Washington and that their agreements with plaintiffs call for disputes to be governed by the law of the states in which they reside. (*See* Dkt. 38, Exs. Y-Z at § 10 & Ex. X at § 8; Dkt. 37, Exs. B-F at § 11.) Microsoft states that, for many issues, there is no conflict in the potentially relevant state laws, but that, where there is a conflict, "the law of the state chosen by the parties to govern their contractual rights and duties will be applied." *Erwin*, 161 Wn.2d at 694. The Court finds it need not resolve this dispute because the arbitration agreements exist and are enforceable under any potentially relevant state law.

REPORT AND RECOMMENDATION
PAGE - 5

"I Accept". (*Id*., ¶7, Exs. K, L.)  The acceptance screen on the console provides a button linking to the full terms of the MSA, while the browser provides the same through the agreement's name in blue hyperlink text.  (*See id.*)

Notice of the arbitration clause and class action waiver appears in capitalized and sometimes bold text on the first page of the MSA and directs the user to the section containing the full text of the agreement.  (*Id*., ¶5, Exs. A-F.)  For example, the MSAs begin:  "**IF YOU LIVE IN . . . THE UNITED STATES, PLEAD READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 15.  IT AFFECTS HOW DISPUTES ARE RESOLVED**."  (*See, e.g.*, Dkt. 37, Ex. C.)  As reflected in the most recently updated MSA, effective October 1, 2020, Section 15 states:

> **Binding Arbitration and Class Action Waiver If You Live In (or, If a Business, Your Principal Place of Business Is In) the United States.** We hope we never have a dispute, but if we do, you and we agree to try for 60 days to resolve it informally. If we can't, you and we agree to **binding individual arbitration before the American Arbitration Association ("AAA") under the Federal Arbitration Act ("FAA"), and not to sue in court in front of a judge or jury**. Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of review under the FAA. **Class action lawsuits, class-wide arbitrations, private attorney-general actions, and any other proceeding where someone acts in a representative capacity aren't allowed. Nor is combining individual proceedings without the consent of all parties**. . . .

(*Id*., Ex. F at § 15 (emphasis in original).)  Disputes covered include "**Everything Except IP**[,]" and the "term 'dispute' is as broad as it can be[,]" including "any claim or controversy related" to the services provided, prices, accounts, or terms of the agreement. (*Id*. at § 15(a).)  Arbitration is to be conducted according to the AAA rules.  (*Id*. at § 15(d).)  Versions of the MSA in effect May 1, 2018 and beyond add the following language: "Under AAA Rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim." (*Id*., Exs. D-F at § 15(d).)

REPORT AND RECOMMENDATION
PAGE - 6

Microsoft notifies users of updates through emails and pop-up notices, appearing when a user logs in and requiring the user to click "Next" before they can proceed. (*Id.*, ¶6, Exs. G-H.) The MSA also includes a "Kids and Accounts" provision stating that, "[b]y using the Services," the user represents "you have either reached the age of 'majority' . . . or have valid parent or legal guardian consent to be bound by these Terms[,]" or that a parent or guardian creating an account "accept[s] these Terms on minor's behalf and are responsible for all use" of the accounts or services. (*Id.*, Exs. B-F at § 4.a.iii.) Microsoft maintains a table that updates whenever a user clicks to manifest assent to the MSA upon opening an account or acknowledging receipt of an update. (*Id.*, ¶¶7-8.) Its records show that each plaintiff accepted MSAs effective May 1, 2018 or later and that their accounts remain active. (*Id.* (reflecting dates of most recent acceptances of MSA as follows: J.A. (8/24/20); C.C. (8/22/20); A.D. (8/8/19); A.H. (8/29/20); J.H. (5/26/18); McFadden (6/5/2018); Petti (8/21/19); Whisnant (8/24/19).)

Plaintiffs contend the "click-through" agreement[2] for Xbox Live Services does not mention and therefore does not apply to Xbox hardware accessories like controllers. This argument does not establish the absence of an agreement to arbitrate. Microsoft shows and plaintiffs do not dispute that each plaintiff assented to the click-through MSA requiring individual arbitration of

---

[2] A click-through or "clickwrap" agreement "'presents the user with a message . . . requiring that the user manifest . . . assent to the terms of the license agreement by clicking an icon. The product cannot be obtained or used unless and until the icon is clicked.'" *In re Wyze Data Incident Litig.*, C20-0282-JCC, 2020 WL 6202724, at *2 (W.D. Wash. Oct. 22, 2020) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002)). A "shrinkwrap" agreement, as discussed below, is an "in-the-box" contract, referring to terms included within the shrinkwrap packaging of a product. *M.A. Mortensen Company, Inc. v. Timberline Software Corp.*, 140 Wn.2d 568, 584-85, 998 P.2d 305 (2000). The parties here appear to agree any state law relevant to this matter allows for the enforceability of either type of agreement. *See In re Wyze Data Incident Litig.*, 2020 WL 6202724, at *2 ("While Washington law relating to clickwrap agreements is scarce, it clearly allows for the enforcement of 'shrink-wrap' agreements, even if the consumer did not read the agreement."; also stating: "courts throughout this circuit have consistently upheld arbitration provisions contained in clickwrap agreements."); (Dkt. 36 at 13-14, 16 (citing cases recognizing validity of clickwrap and shrinkwrap agreements under California, Illinois, Maryland, New York, and North Carolina state law).)

REPORT AND RECOMMENDATION
PAGE - 7

disputes before and under the rules of the AAA and providing for the arbitrator to rule on any issues of arbitrability. Any dispute as to the scope of the MSA, including its applicability to the controllers, must be decided by the arbitrator. *See, e.g., LeBoeuf v. NVIDIA Corp.*, 833 F. App'x 465, 466 (9th Cir. Jan. 14, 2021) (rejecting contention valid arbitration agreement did not exist where plaintiffs' claims related to hardware, not software "because the undisputed facts show [they] entered into a valid arbitration agreement when they twice assented" to a license agreement and "[a]ny dispute as to the scope of that agreement, and whether [their] claims fall outside the agreement, must be determined by the arbitrator under the License Agreement's delegation clause.") (citing *Henry Schein, Inc.*, 139 S. Ct. at 530).[3]

      2.      <u>Shrinkwrap agreement</u>:

Xbox controllers, purchased in a standalone controller box or bundled with an Xbox console, come with a product guide in the box informing the purchaser that use of the controller manifests agreement to Microsoft's terms of use. (Dkt. 38 (Decl. of Jamie O'Connell), ¶4, Exs. A-E.) The guides state on the first page, immediately under the heading, "**AGREEMENT TO XBOX ONE LIMITED WARRANTY AND SOFTWARE LICENSE TERMS**":

> You must accept the Xbox Terms of Use . . . at xbox.com/live/termsofuse, . . . and the Limited Warranty at xbox.com/xboxone/warranty to use your Xbox One console[ or] Xbox accessories . . . By using your Xbox One console[ or] Xbox accessories . . . , you agree to be bound by these terms. Please read them. If you do not accept them, do not set up or use your Xbox One console[ or] Xbox accessories . . . . Return the Xbox product to Microsoft or your retailer for a refund.

(*Id.*, Exs. A-C, E at 1.) After October 2019, the heading included, "**(WITH BINDING**

---

[3] Microsoft argues it will likely have the better of the arbitrability argument regarding the controllers in arbitration. Given the delegation provision, the Court does not consider any such arguments. *Munning v. Nordstrom, Inc.*, C19-1810-RSL, 2020 WL 1528477, at *2 (W.D. Wash. Mar. 31, 2020).

REPORT AND RECOMMENDATION
PAGE - 8

**ARBITRATION AND CLASS ACTION WAIVER IN THE U.S.)**", followed by text stating use of the product indicated agreement to the "Warranty & Agreement". (*Id.*, Ex. D at 1.) Text further directed purchasers to "**please read the binding arbitration clause and class action waiver**" at the URL (webpage address) provided there and on page five of the agreement, and noted it bound the purchaser and affected how disputes regarding the product would be resolved. (*Id.*)

Pages four or five of all of the product guides at issue informed purchasers:

> **If you live in the United States, Section 9 of the Limited Warranty contains a binding arbitration clause and class action waiver, available at xbox.com/xboxone/warranty/arbitration. The arbitration clause affects your rights about how to resolve a dispute with Microsoft. Please read it. Parts of the arbitration clause are described below.**

(*Id.*, Exs. A-C, E; *see also* Ex. D (summarizing warranty terms and arbitration agreement in bold font and directing consumers to URL for full terms).) The guides further advised that any dispute not resolved by informal negotiation or in small claims court "will be resolved only by individual binding arbitration under the [FAA]" and the AAA rules. (*Id.*, Exs. A-E.)

In addition, the boxes containing the controllers also alerted purchasers that use of the product required acceptance of Microsoft's warranty agreements. (*Id.*, ¶5, Exs. F-X.) For example, a 2015 Xbox One/Elite Controller bundle box stated after the heading, "**IMPORTANT!**", that the purchaser must accept Xbox Software License Terms, the MSA, and the Limited Warranty at the URLs listed, while a May 2017 standalone box containing a standard controller stated, "**You must accept the Warranty & Agreement** at xbox.one/xboxone/warranty." (*Id.*, ¶5, Exs. F-G, Q, U.)

The URLs identified in the product guides and on controller boxes contained the warranty

agreements, including the binding arbitration clause and class action waiver, which provide for individual arbitration before the AAA, according to AAA rules, for all disputes not related to intellectual property, with "dispute" defined as "broad as it can be" or "given the broadest possible meaning allowable under law." (*Id*., ¶6, Exs. X-Z at § 15.) The warranty agreements in effect after August 30, 2018 added: "Under AAA Rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim." (*Id*., Exs. Y-Z at § 11(d).)

Plaintiffs assert the shrink-wrap agreement in the Xbox controller packaging is unenforceable due to the failure to provide sufficient notice of the terms. *See Norcia*, 845 F.3d at 1289 (recognizing that, under California law, "even if a customer may be bound by an in-the-box contract under certain circumstances, such a contract is ineffective where the customer does not receive adequate notice of its existence.") They point to the Ninth Circuit's decision in *Norcia*, 845 F.3d at 1289, considering a product box containing a "Product Safety & Warranty Information" brochure, and thus indicating it contained safety information and the seller's warranty. The Ninth Circuit found a reasonable person would not have been on notice the brochure "contained a freestanding obligation outside the scope of the warranty[,]" or that receiving the warranty and failing to opt out of an arbitration provision contained within would constitute assent to "a provision requiring arbitration of all claims against the seller, including claims not involving the warranty." *Id*. at 1289-90. Plaintiffs contend a reasonable person would similarly not be on notice pamphlets labeled "Xbox One Accessory Product Manual" contained information limiting consumer rights. They deny inclusion of language directing the consumer to accept certain terms located at different URLs or burying the summary of the arbitration agreement on later pages sufficed to provide notice. They describe the text on the outside of the product boxes as small, inconspicuous, and lacking sufficient or in some cases any mention of an agreement, terms, or

anything indicating the consumer is entering into a bilateral contract to arbitrate. Again, however, plaintiffs fail to establish the absence of an agreement to arbitrate.

In Washington and elsewhere, an in-the-box contract may be found effective so long as the consumer receives adequate notice. *See, e.g., Kwan v. Clearwire Corp.*, C09-1392-JLR, 2012 WL 32380, at *9 (W.D. Wash. Jan. 3, 2012) ("[T]he central issue of concern in Washington in determining whether or not a consumer is bound by an alleged contract is whether the consumer has notice of and access to the terms and conditions of the contract prior to the conduct which allegedly indicates his or her assent."); (Dkt. 36 at 16-17 (describing other state law).) "Under Washington law, a consumer "'cannot successfully argue that the contract is unenforceable as long as [he or she] was not *deprived of the opportunity* to read it.'" *Schmidt v. Samsung Electronics Am., Inc.*, C16-1725-JCC, 2017 WL 2289035, at *2 (W.D. Wash. May 25, 2017) (citations omitted; emphasis added). "For instance, Washington law permits 'shrink-wrap' contracts contained within a product box, even if the consumer did not admit to reading that contract." *Id*.

In *Schmidt*, this Court found sufficient notice of an arbitration agreement where a brochure in a product box contained a generic title, "Product Safety and Warranty Information" or "Important Information", but, unlike *Norcia*, also provided notice "additional [] terms and conditions applied[,]" and included an arbitration agreement and opt-out provisions within the brochure. *Id*., at *3 ("At the beginning, each brochure warned the reader that "**by using this device, you accept those [contained] terms and conditions**," and instruct the viewer to "**READ THIS INFORMATION BEFORE USING YOUR MOBILE DEVICE**.") Because the plaintiffs had "adequate notice that additional terms and conditions existed, and should have read

REPORT AND RECOMMENDATION
PAGE - 11

further to inquire[,]" they had assented to arbitration.  *Id.*[4]  *See also In re Samsung Galaxy Smartphone Mktg. & Sales Practices Litig.*, 298 F. Supp. 3d 1285, 1294-95 (N.D. Cal. 2018) (boxes had "classic contractual language by giving users notice of additional terms and conditions[]" and "would make a reasonable person aware of the existence of other binding conditions as part of the purchase."; covers of guidebooks in boxes, while containing generic titles referring to product safety and warranty information, made clear "terms and conditions" were contained within, provided that the consumer would be bound by using the product, and prompted the consumer to read the guidebook to find the terms and, therefore, provided "sufficient information to direct the consumer to the arbitration provision.")

Here, similar to *Schmidt*, the product guides followed any generic title with specific language warning consumers they must accept Microsoft's terms of use and that, through the use of the product, agreed to be bound by those terms.  After October 2019, the title itself explicitly advised of the existence of the binding arbitration clause.  Moreover, in any of the product guides at issue, reading further showed the terms of the agreement included a binding arbitration clause and provided specific language relevant to that provision, including the fact any disputes would be conducted under the FAA and according to the AAA and its rules, as well as a URL leading to the full text of the agreement.  The product boxes also provided an additional warning to consumers of the requirement to accept the terms of the agreement.  Microsoft, as such, provided adequate

---

[4] The Court provided a detailed discussion of how the defendant in *Schmidt* had "cured many of the defects" at issue in *Norcia* and a similar case. *Schmidt*, 2017 WL 2289035, at *4 ("Whereas the *Norcia* packaging simply noted that the 'Package Contains ... Product Safety & Warranty Brochure,' . . . the packaging at issue here stated that the 'Device purchase [is] subject to additional Samsung terms and conditions,' . . . , thus giving . . . notice of additional contractual terms and conditions[.] The brochure itself was labeled 'Important Information,' thus expanding the reasonable scope of the brochure beyond just safety and warranty information. . . Defendants' brochure contained reference to arbitration in the table of contents and on the second numbered page, . . . , neither of which is reflected in the *Norcia* record.")

REPORT AND RECOMMENDATION
PAGE - 12

notice to plaintiffs as to the existence of the binding arbitration clause. For this reason, and for the reasons stated above, the Court finds the evidence to show both click-through and shrinkwrap agreements to arbitrate with Microsoft.

C.     <u>Challenges to Agreements</u>

Plaintiffs raise a number of challenges to the validity and enforceability of the agreements to arbitrate. They contend any agreements are void in that they are procedurally unconscionable contracts of adhesion, with unfair surprise of terms, and substantively unconscionable in imposing a significantly reduced statute of limitations. *See Burnett v. Pagliacci Pizza, Inc.*, 196 Wash. 2d 38, 54, 470 P.3d 486 (2020) (either procedural or substantive unconscionability is sufficient to void an agreement). They maintain the arbitration provision and class action waiver are invalid under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 393 P.3d 85, 93-95 (2017), as to California claims because they prelude California consumers from pursuing public injunctive relief in any forum. They also argue the agreements cannot be enforced against the minor plaintiffs, each of whom disaffirmed the contracts. (*See* Dkt. 39 at 19-20 (citing relevant case law).) Plaintiffs maintain these challenges are properly before the Court because the question of whether a claim is subject to a valid arbitration agreement and "whether the agreement encompasses the dispute at issue" is for the court to decide. *See Revitch v. DIRECTV, LLC*, 977 F.3d 713, 719 (9th Cir. 2020) ("We determine '(1) whether a valid agreement to arbitrate exists' and '(2) whether the agreement encompasses the dispute at issue.'") (quoting *Chiron*, 207 F.3d at 1130).

Plaintiffs also challenge the delegation provisions in the agreements as procedurally unconscionable and unenforceable, and a gateway issue for the Court to resolve. They argue presentation of the delegation clause through incorporation by reference to AAA rules is a procedurally unconscionable contract of adhesion in depriving consumers of a reasonable

REPORT AND RECOMMENDATION
PAGE - 13

opportunity to understand they were agreeing to have an arbitrator decide arbitrability. (Dkt. 39 at 30 & n.4.) The Court, for the reasons discussed below, does not find this contention or any other challenge to undermine the validity or enforceability of the agreements to arbitrate.

Where a contract delegates arbitrability to an arbitrator, the court may not override the contract. *Henry Schein, Inc.*, 139 S. Ct. at 526-29. That is, "[w]hile the Court determines the existence of an arbitration agreement, the arbitrator adjudicates its validity if the parties have delegated that authority." *Moffett v. Recording Radio Film Connection, Inc.*, C19-3319, 2020 WL 6143595, at *3 (C.D. Cal. Jan. 31, 2020) (citing *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017)). *Accord Rent-A-Ctr., W., Inc.*, 561 U.S. at 63, 68-69. "If an arbitration provision contains a delegation clause, the Court's inquiry ends." *Diaz v. Nintendo of America Inc.*, C19-1116, 2020 WL 996859, at *1 (W.D. Wash. March 2, 2020). Only a challenge to the enforceability of the delegation provision itself, as opposed to the arbitration agreement as a whole, may be decided by the Court. *Brennan*, 796 F.3d at 1133-34 (delegation provision enforced where plaintiff failed to challenge that provision, the "agreement to arbitrate arbitrability", and instead argued the arbitration clause as a whole was unconscionable, which was a determination for the arbitrator) (citing *Rent-A-Center, W., Inc.*, 561 U.S. at 73-75).

As stated above, under Ninth Circuit law, "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Id*. at 1130. Plaintiffs correctly observe the Ninth Circuit limited this holding to the facts of the case, which involved an arbitration agreement in an employment contract between sophisticated parties. *Id*. at 1130-31 ("[W]e need not decide nor do we decide here 'the effect [if any] of incorporating [AAA] arbitration rules into consumer contracts' or into contracts of any nature between 'unsophisticated' parties.") (quoted sources omitted). However, the Ninth Circuit also clarified its decision "should

not be interpreted" to require application of the holding only to sophisticated parties or commercial contracts, and noted the "vast majority" of circuits had not so limited similar holdings. *Id*.

Subsequently, this Court observed "the greater weight of authority since *Brennan*, including within this District, concludes that *Brennan's* holding also applies to disputes involving non-sophisticated parties[,]" followed that authority, and found the issue of arbitrability delegated to the arbitrator via incorporation of AAA rules in a case involving a consumer transaction. *Weimin Chen v. Sierra Trading Post, Inc.*, C18-1581-RAJ, 2019 WL 3564659, at *5-6 (W.D. Wash. Aug. 6, 2019) (citing *Schmidt*, 2017 WL 2289035, at *6 (incorporation of AAA rules within consumer transaction was 'clear and unmistakable' evidence of intent to delegate the arbitrability question to an arbitrator); *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 991-92 (N.D. Cal. 2017) (same); *Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 974 (N.D. Cal. 2015) (stating cases that conclude less-sophisticated parties do not clearly and unmistakably delegate arbitrability by incorporation of AAA rules are "at odds with the prevailing trend of case law")). *See also In re Wyze Data Incident Litig.*, No. C20-0282-JCC, 2020 WL 6202724, at *3 (W.D. Wash. Oct. 22, 2020) (inclusion of AAA rules constituted clear and unmistakable evidence of the intent to delegate arbitrability to the arbitrator in a case involving consumer purchasers of internet-enabled home security cameras); *McLellan v. Fitbit, Inc.*, C16-0036, 2017 WL 4551484, at *2 (N.D. Cal. Oct. 11, 2017) (*Brennan's* holding applies to unsophisticated parties, including consumers).

More recently, the Ninth Circuit found as to minor plaintiffs who had entered into an agreement associated with their use of video games:

> [T]he teenagers clearly and unmistakably agreed to arbitrate questions of arbitrability because the arbitration agreement incorporates AAA rules. [Their] degree of sophistication does not change this conclusion because, under Washington law, "[c]ourts presume that parties to an agreement have read all parts of the entire contract and intend what is stated in its objective terms," and

REPORT AND RECOMMENDATION
PAGE - 15

>   "[c]ontractual language must … be interpreted in light of existing … rules of law[.]"

*G.G. v. Valve Corp.*, 799 F. App'x 557, 558-59 (9th Cir. Apr. 3, 2020) (cited and quoted sources omitted).  The Court here has no difficulty in finding plaintiffs fail to show the delegation clauses are unconscionable, and finds the delegation of arbitrability issues to the arbitrator enforceable through the incorporation of AAA rules.  (*See also* Dkt. 37, Exs. D-F at § 15(d) and Dkt. 38, Exs. Y-Z at § 11(d) (adding:  "Under AAA Rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim."))

Nor do plaintiffs succeed in their challenges to the arbitration agreements as a whole.  The question of whether the agreements cover the claims at issue is not for this Court to decide.  The arbitration agreements apply to any dispute other than intellectual property rights, with the term "dispute" defined as "broad as it can be" or "given the broadest possible meaning allowable under law."  (Dkt. 37, Ex. A at § 18, Exs. B-F at § 15; Dkt. 38, Exs. X-Z, at § 9.)  Unlike *Revitch*, 977 F.3d 713, the agreements also contain delegation provisions, adopt AAA rules, and delegate arbitrability issues to the arbitrator.  As such, the enforceability of the agreements, including any question of unconscionability, must be determined by the arbitrator.  *See, e.g., In re Wyze Data Incident Litigation*, 2020 WL 6202724, at *3-4 (arbitration agreement covering "'all disputes and claims'" and intended to be broadly interpreted necessarily included enforceability of agreement, and inclusion of AAA rules constituted clear and unmistakable evidence of intent to delegate arbitrability to arbitrator; "The question of whether the arbitration provision here is unconscionable must be determined by the arbitrator."); *Willis v. Fitbit, Inc.*, C19-1377, 2020 WL 417943, at *4 (S.D. Cal. Jan. 27, 2020) (contention arbitration provision as a whole, rather than delegation

provision, was procedurally and substantively unconscionable must be heard by arbitrator).[5]

Likewise, the issue of disaffirmance may not be determined by the Court. First, the minor plaintiffs disaffirm only the "End User License Agreement" relating to their controllers. (Dkt. 32, ¶¶ 19 (J.A.), 52 (C.C.), 26 (A.D.), 33 (A.H.), 40 (J.H.)) They do not express an intent to disaffirm the MSA or indicate they have stopped using Xbox live. *See G.G. v. Valve Corp.*, C16-1941-JCC, 2017 WL 1210220, at *3 (W.D. Wash. Apr. 3, 2017) (finding arbitration agreement with minor plaintiffs valid and alleged disaffirmance "unsupported by law and fact" where they continued to use the defendant's content and services: "Plaintiffs' continued use is contingent on accepting the SSA and its agreement to arbitrate. Therefore, Plaintiffs have only disaffirmed the SSA in name, but not in practice, because they continue to receive benefits from the SSA by their continued use of Defendant's products."), *vacated in part on other grounds*, 799 F. App'x 557 (9th Cir. 2020). Second, the issue of the minors' disaffirmance of the warranty agreements is a challenge to the validity of the agreements as a whole and an arbitrability issue to be decided by the arbitrator. *See, e.g., Kuznik v. Hooters of Am., LLC*, C20-1255, 2020 WL 5983879, at *4 (C.D. Ill. Oct. 8, 2020); *Ingram v. Neutron Holdings, Inc.*, 467 F. Supp. 3d 575, 584-85 (M.D. Tenn. 2020).

The Court, finally, also finds the pursuit of public injunctive relief by the California plaintiffs an issue to be determined by the arbitrator. Plaintiffs' challenge under *McGill*, 393 P.3d 85, targets neither the existence of an agreement, nor the delegation clause itself. As found by numerous district courts, "where there is a clause delegating arbitrability questions to an arbitrator, it is for the arbitrator to decide if *McGill* makes the contract, or portions thereof, invalid." *Moffett*, 2020 WL 6143595, at *3 (collected cases omitted). *See also Marselian v. Wells Fargo & Co.*, C20-3166, 2021 WL 198833, at *5-6 (N.D. Cal. Jan. 20, 2021); *Mondigo v. Epson Am., Inc.*, C20-

---

[5] Having found as such, the undersigned does not address the arguments as to unconscionability.

REPORT AND RECOMMENDATION
PAGE - 17

4400, 2020 WL 8839981, at *4 (C.D. Cal. Oct. 13, 2020).

Further, and pursuant to the arbitration agreements, if the arbitrator finds the issue of public injunctive relief cannot be arbitrated and finds Microsoft liable under California law, the case would return to this Court for a determination as to public injunctive relief.  (Dkt. 37, ¶¶8(c), (g), Exs. E-F at § 15(i) (arbitration agreements in MSAs applicable to California plaintiffs provide that, if any "part" of the binding arbitration and class action waiver provision "is found to be illegal or unenforceable, the remainder will remain in effect (with an arbitration award issued before any court proceeding begins[.])"); Dkt. 38, ¶2, Ex. Y (same for standard controllers purchased by California plaintiffs)); *Gilbert Enterprises, Inc. v. Amazon.com*, C19-2453, 2019 WL 6481697, at *4 n.2 (C.D. Cal. Sept. 23, 2019) ("Although challenges to the arbitration agreement as a whole may subsequently return to this Court if an arbitrator rules that the Court must decide them, the Court is obligated to enforce the delegation clause absent specific challenges to it."); *Dornaus v. Best Buy Co.*, C18-4085, 2019 WL 632957, at *4 (N.D. Cal. Feb. 14, 2019) (where severability clause provided, "'[i]f any *part* of this arbitration provision is deemed invalid or unenforceable, the other terms shall remain in force'", court concluded:  "While the remainder of plaintiff's action must be compelled to arbitration . . . –including all questions of liability – the court shall retain jurisdiction over the adjudication of plaintiff's request for public injunctive relief, should defendant be found liable for the California statutory claims, which are brought on behalf of the public and for which public injunctive relief may be available.") (emphasis added).  Cf. *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 831-32 (9th Cir. 2019) (severability provision provided for entire "claim" to be severed for judicial determination, not "only . . . a particular remedy"), and *Snarr v. HRB Tax Grp., Inc.*, 839 F. App'x 53 (9th Cir. Dec. 9, 2020) ("*Blair* involved very similar severability language and held that the entire claim under the statute must be severed from

REPORT AND RECOMMENDATION
PAGE - 18

arbitration, rather than just the public injunctive remedy.")[6]  The Court should, as such, compel arbitration of plaintiffs' claims, but retain jurisdiction.

## CONCLUSION

The Court should, in sum, GRANT Microsoft's Motion to Compel Arbitration and Stay Claims (Dkt. 36).  The Court should STAY these proceedings pending the outcome of the individual arbitration of plaintiffs' claims, and should direct the parties to file a Joint Status Report upon the completion of arbitration.

## OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 23, 2021**.

DATED this 2nd day of April, 2021.

Mary Alice Theiler
United States Magistrate Judge

---

[6] In *Blair*, the Ninth Circuit recognized parties could, but had not in that case, "split decisionmaking between a court and an arbitrator" in this manner.  *Blair*, 928 F.3d at 831-32 (referring to rejected reading of severance clause as requiring arbitrator to first adjudicate liability of a claim and leaving "potential public injunctive remedy" for the court).  *See also Moffett*, 2020 WL 6143595, at *4 (distinguishing *Blair* as involving determination agreement delegated interpretation of a paragraph requiring individual arbitration to a court and the "ultimate decision to sever the public injunctive relief claims from arbitration [as] based on the specific language of the agreement") (citing *Cooper v. Adobe Sys. Inc.*, C18-6742, 2019 WL 5102609, at *7 (N.D. Cal. Oct. 11, 2019) ("*McGill* and *Blair* do not hold that all claims seeking public injunctive relief must be litigated in court."))

REPORT AND RECOMMENDATION
PAGE - 19